Council, please approach the bench. Identify yourself. Good morning, Your Honor. My name is Kurt Levitas. I represent Kleins. What's your name again? Kurt, K-U-R-T, last name Levitas, L-E-F-O-D as in Victor, I-T-U-S. Thanks. Chris Burghoff for the respondents. It's B-E-R-G-H-O-F-F. All right. You'll each have 15 minutes. Appellant can save time for rebuttal if you choose. Yes, Your Honor. I would like to save three minutes, please. All right. You may proceed. May it please the Court. Your Honors. You may. This case involves the question of whether a plaintiff can lose his legal right before he even knows he had it. In this case, my clients, Nora Johnson, John Aarons, and Gail Farron, are nieces or relatives of Francis Marshall. Their claim arises out of the estate plan and conduct related thereto of their aunt and relative, Francis Marshall. Do you have any specific – you make allegations throughout this, but I find nothing in the record to support any factual allegations as to just about anything. You've got conclusions. Everything is a conclusionary statement on information and belief. That don't buy you even time here. So my question is, do you have any sound factual basis? The record reflects the discovery that has taken place. The record does not reflect. Well, the only discovery that has taken place to date, Your Honor, is the exchange of documents. Not a single deposition has proceeded. Not a single affidavit. Who are you going to depose? The first person we'd want to depose would be Eric Jostock, who was present when the alleged stock transfers took place, who was the estate planner and the advisor and counselor to Jay Marshall and Francis Marshall at the time. And he prepared the trusts as well as their wills. And he would be the first person we'd like to depose. Now, why didn't your people, if they were so hot to trot over, you know, what they're going to get, quote, unquote, did they have any history or any relationship at all with this father, unrelated father? Jay Marshall. They knew him, yes. But they didn't participate. They didn't do anything in the estate of Francis. They had no standing to do so. They didn't receive notice of it. They weren't heirs of law. They weren't legatees. They were takers as contingent. They took property. Only as contingent beneficiaries after the death of Jay. So they could have looked in at that time. No, they would have no legal right to. I don't think they have standing to file an appearance in Francis's probate. Upon Francis's death, her will, which was probated, was a pour-over will, pouring everything into her trust. There were no assets in her estate. Her trust left everything to her surviving husband, Jay. He survived her, which he did. And after his death, to my client. But they made no inquiries at that time. They had no reason to know because they didn't know what Francis's trust said. They could have found out. Again, so far everything you've given me is a conclusion. I respectfully disagree, Your Honor. There is no way they could have found out legally. I did probate. I could get into any estate if I wanted it. At most, we could have seen the trust. Where is the factual basis for the allegation that Francis intended that the stock go into her estate plan? The shares were, if they existed, were all held in joint tenancy up until that point in time. That's correct. Where do you get the factual basis for that allegation? It seems like it's just strictly a conclusion here. Based on what she told her family and the relationships and also what she did with her other assets. That's the key. Her other asset, namely the real estate, which was a huge portion of the estate, was divided. During Francis's lifetime, in fact, shortly after the trust was executed, was divided one-half to her estate, one-half to Jason's. That may be so, but simply because the two of them decided in their estate plan to put certain assets in the trust and perhaps certain assets someplace else or take the stock and transfer that from joint tenancy into his trust. How do you know that that was not part of their estate plan? I don't know for certain. It's possible. But you have no basis to conclude otherwise. That's your conclusion, possible. Even if you were to have access to any and all documents, which the hospital doesn't say much, it's still conclusionary. You're not going to be able to establish what occurred at that date from anybody that's presently alive. That's incorrect, Your Honor, if I may. You think you're going to get something out of this, what's his name? Joe Schuckey. All he's going to tell you is he did what he was told. That may be true. That's what he was going to tell me. So then where do you go from there? I would like also to propose the two bankers who put the medallion guarantees on the alleged stock transfer. The stock transfer document, which is the whole documented issue, that's the million-dollar transfer document. Using a document that is contained in the record, it looks like to us that it's been used many times. There's medallion guarantee signatures on it. Now, there's other documents on which there was no medallion guarantee signature. To do a medallion guarantee signature, bankers have to come, sit down with the person, take their ID or know them personally and talk with them about the transaction a little bit and then execute the medallion signature. Even if they were to say they did not do that, you're not going to get anything more. Isn't the stock going to go back to where it was before, to go back to the joint tenancy that it was held in? No, Your Honors. I seek a constructive trust in my pleading, my Second Amendment complaint, and also I have a tortious interference comp. But you're assuming then that there was some estate plan other than what's before the court. We know what the trusts say, but you would have to manufacture some other type of estate plan to show that that stock should not go back to the joint tenancy that it was held in. Other than simply invalidating the stock transfer, there could be other results. If the stock transfer were invalidated and there were no other remedies available to my clients, then yes, it would revert to the status quo ante, which is joint tenancy. And it's up in Jay's estate then, right? Yes, but we're alleging that the stock transfer was done by Jay as part of his scheme. So he committed a tort in getting Frances to execute that document, if she did. So the whole transfer of depleting her entire estate of assets before she went to the nursing home in 1993. All of those allegations are on information and belief with no factual basis. That's correct. That's why the complaint was dismissed. I respectfully disagree, Judge. The trial court found that the latches is the appropriate reason for dismissal of this complaint and claim because our clients waited too long, delayed in asserting their rights. And there was prejudice to Jay's estate. That's what the trial court found. And I believe, for the reason stated in my brief, the trial court was in error. My clients didn't even know that they were in Frances' trust until they sat down with Eric Jostock a month after Jay's death in June of 2005. They asked for some information. They weren't getting it enough and quickly enough because there's only a six-month statute. They went to a lawyer. He didn't get enough. He hired me. I filed a claim on the last day. Wasn't the essence of the trial court's holding that whether you know or not, there may have been a duty to inquire when Frances died? That was what the trial court stated, that my clients should have inquired prior to Jay's death. And that's three years before Jay died. That's correct. I might keep coming back to your conclusionary allegations, but my question to you is, even if we vacated this and sent it back and there was a hearing, including the attorney and these two gentlemen you say, it's still supposition. You are not going to get anything that can ultimately change the outcome. I disagree respectfully, Judge. If evidence is presented that Frances did not actually sign these documents or didn't know what she was signing. Well, who's going to say that? Well, in practicality, Judge, if you're saying that whatever may have happened in 92 or 3 or 4, I'm not going to be able to prove it, you might ultimately in truth and practicality of human beings and people who engage in these kind of things, you might be right. But I'm entitled to fight for it. I believe my clients have been cheated out of a million dollars. And they're not even blood relatives. So technically they're not directly entitled to anything in most states. They're not entitled to anything from Jay because they're not blood relatives of Jay. They are, in fact, blood relatives of Frances. Jay and Frances never had any kids together. It was a second marriage. Jay had kids from a prior marriage. Frances had no children ever, but she did have a brother and sisters and nieces. This is the brother and the nephew and niece? Two nieces. Two of them worked at the magic shop where Frances and Jay ran their business. That was the family business. They were all involved in magic for many years. And half of that, half of the magic store, Magic Inc., is in Frances' trust and half is in Jay's trust. All the assets except the liquid assets were put half and half, but all the cash, anything of liquid value, before Frances went in the nursing home, went to Jay as trustee of his own trust. And that, we allege, is wherein lie Jay's wrongful conduct. We've pled tortious interference. We've pled conversion. And we've pled fraud in the factum, which is where it might be that Frances didn't know what she was signing. Her medical history, we know a little bit about it, but we don't have the medical records because the court wouldn't let us look at them. But clearly Frances had already had a mastectomy. She was on her way to the nursing home. Her signature speaks for itself. We'd like to know what she knew or could talk or how these documents were signed. I sure would like to talk to those medallion bankers. Didn't the hospitals give you some records and say there was nothing really available? They had very little there. One of two. Swedish Covenant? One of two. We've subpoenaed Anderson Pavilion and Swedish Covenant. Anderson Pavilion said, we don't have any records. I would have followed up on that generally. I often do a plaintiff's personal injury lawyer also, so I've gotten that many a times in my life. But anyway, I had no opportunity to follow up. The second thing, though, we did get records from Swedish Covenant. However, it was after the court quashed the subpoena, and pursuant to the court's order, I had to keep it under seal, which I did, and I delivered it to Judge Coleman's chambers, where I imagine it still sits. It was about two inches high. That's all I know about those records. Frances stayed in the nursing home about eight years until her death, after this trust was signed, right before she went in. Your Honors have mentioned that my allegations are conclusory, and we are in the world of intentional conduct. I'm pleading intentional conduct, and that's a problem for me. But I have one thing in my favor, and that is the fiduciary relationship. Jay was both a fiduciary in fact and in law as to Frances. In fact, because Frances was sick and reliant on him to handle her affairs. He was her husband. She relied on him to get around and do things for her. In law, because the moment Frances signs her trust, naming Jay as her trustee, he's a fiduciary in law. So as both of those, after March 8, 1994, Jay has duties. Under applicable law regarding estate challenges and allegations of the kinds of actions that I've pled, under a fiduciary relationship, the burden switches. The burden of proof really is on Jay Marshall to show that he or his estate or his representatives to show that what he did was okay, was what Frances wanted, that he honored his duties by honoring Frances's intentions. And in every fiduciary case like this where there's an alleged cover-up and hiding information, the plaintiffs are always in the dark. In fact, that's how it's supposed to be from the point of view of the schemer, if you will. And so we were in the dark. We were in the dark. My clients were in the dark until they sat down with Mr. Jostock who informed them in June of 2005 that, A, they were in Frances's trust the first time they learned that, and, B, they take, here are the assets that are in there, and they said, wasn't there any cash? And they said, no, not a nickel. So that's when they began to inquire, and getting no answer, I had no choice but to file a claim on the last day, and we proceeded into litigation. It is our position that there was no delay by my clients, that they acted as soon as they knew, which is always the key to latches. What did the plaintiff know and when? In our case, the plaintiffs first learned of their potential rights under Frances's trust in June of 2005, and they acted promptly thereafter. And finally on the discovery, as I've stated in the brief, Frances's mental and physical condition is an issue both in fiduciary and fact and in the execution of the stock transfer, and for that reason those documents should have been allowed to be discovered by my clients. Thank you, Your Honors. Thank you. May it please the Court. Counsel. Initially to respond to something that the appellant has said regarding these depositions that he would take. This proceeding has lasted three years. He's filed no notices or sent out any subpoenas for oral depositions. Over a three-year period. Over a three-year period. 6,700 pages of documents were turned over from the estate, so there has been substantial discovery, yet there's still a pleading that exists in the form of a Second Amendment complaint that is or claim that is largely conclusory, allegations on information and belief. We think the Circuit Court got it right when they determined that Latches was applicable to this case. Latches is to be applied based on the circumstances of each case, and in this case we have the Bobbin case, which dictates the rule that someone doesn't have to have actual knowledge of the existence of facts to support their claim, if the circumstances are such that they should be put on notice that they may have that claim and inquire about it. In this case, based on the facts that are alleged in claimant's Second Amendment claim, we know that they believe that their aunt and sister, in one case, had stock that she owned, that she brought into the marriage with Jay in 1954, and they allege that as of 1993 it was worth millions of dollars, and they also allege their belief that she intended for them to have that. She dies. They know she dies. Her estate's probated. It's a public record. Claims notice is published. They do nothing. They take no action. They get nothing from the estate. That alone was enough for the court to put them to that minimum duty. The claimant notice started them. Absolutely. And that's a reasonable person who believes they're going to inherit from an estate. They get nothing when that person dies. They know the husband. They could have called him. They could have filed a claim in the probated estate. There are any number of steps they could have taken through which they could have discovered. He says they couldn't if they had no standing. That's absolutely incorrect. If they believe they have any standing to make a claim in an estate, anybody can bring a claim. Her estate was closed, what, about a year before Jay died? That's correct. 2004? Correct. Jay died approximately three years after Frances. They make a big deal about what they didn't know prior to Jay's death. They say they didn't know they were beneficiaries of Frances' trust. In their own claim, they allege they didn't learn about the trust until 2005. That's true. So at the time of Frances' death, all they knew was that they were potentially going to inherit some money from their aunt. And they got nothing. Even more reason to hold them to that minimal duty to inquire at that time. And they didn't do it. And as a result, by waiting until Jay died, the estate is severely prejudiced in its ability to defend against this claim. And they make a lot about what Jay's duty was to the claimants. As trustee of Frances' trust, he never had a duty under the terms of the trust in Section 8 to file any accounting to them. His duty was to the current income beneficiary, which would have been Frances during her lifetime. Also, if we look at the case of LaSalle v. Durbin, one of the standards that it says the court should look to in deciding if Latches is applicable is whether or not the defendant himself has any knowledge whatsoever that the claimants intend to make the claim that they ultimately make. In this case, there's no allegation that would support Jay having any knowledge that these claimants were going to come forward at any time and make a claim in regard to these stock transfers that were part of their estate planning process back in 1994. But he had no reason to give them any notice at any time. So really, it's not about what Jay didn't do, about his silence being somehow an intentional concealment of fraud. It's about their failure to inquire when they reasonably should have inquired and the resulting prejudice by their delay. And that delay is significant in this case. We now have two individuals who created an estate plan in 1994 who are deceased. It would be difficult, if not impossible, for the court ultimately to determine what their intent was at that time in regard to the funding of that plan. In fact, looking at it just from the outside, we have Jay Marshall had two children prior to the marriage in 1954. Frances had none. She had relatives. Those relatives were not heirs at law of her estate when she died. In doing their plan, they benefited both sides. They didn't benefit them equally. Who knows why that is? It might be logical to presume that they chose to benefit Jay's children over her nieces and sister. But I don't think that any further discovery, any depositions are going to lead us to information about what the true intent was of Frances Marshall and Jay Marshall when they went through that process. In essence, we agree with the circuit court's decision that Latches is a claim. They haven't presented a reasonable excuse for the delay from Frances' death until Jay's death for inquiring at all as to their rights in her estate as potential beneficiaries or legatees. And the prejudice caused by that delay is overwhelming as a result of Jay's death. Wherefore, we respectfully request that the ruling of the circuit court should be affirmed. Thank you. Thank you. Mr. Court, your Honor, just to address a few of the points. One, no notice of death was ever filed. That's true. It was pretty clear. We're getting the leadings in order in the history of this case. And it was pretty clear after the quashing of my medical record subpoenas that discovery was going nowhere until it was a pet issue on the pleadings. So the next step was to file another complaint, which I did. I amended. Then I amended a second time. And thereafter, we were going to get into discovery in earnest, including oral discovery, but it was dismissed, and that's why we're here. So no notice of death was filed because we weren't in the discovery phase yet. And it was pretty clear from the court's ruling on the subpoenas that discovery was not to be ongoing until we were at issue. And then we got the Bobbin case. All the cases cited where latches had been upheld by the appellate court involved one of two situations. The plaintiffs either knew or had involvement in the transaction. Some of the corporate cases where a party was a partner or a corporate officer and did nothing for 30 years, the court said, no, you should have done something if you're part of the corporation. So, too, in all the other cases that are testamentary cases, the parties were on actual notice one way or the other, be it an inventory filed, a petition, some other statement that someone says, this is my farm. The issue was joined. In our case, there was never a time when Jay said, you three people get nothing out of Francis' trust, no cash. He never told anybody that. And we never even had an opportunity to learn. On the issue of standing, it's noteworthy. Mr. Bobov stands here today and says we had standing to inquire into the probate case. Yet, in his brief, he says we have no standing to even bring this lawsuit. It rings a little hollow, I think. But I think he's right the second time that we really had no standing to inquire and learn of the provisions, and certainly the assets and inventory of Francis' trust prior to Jay's death. Remember, it was a trust. Jay was the sole beneficiary, lifetime beneficiary of her trust, and her will was to pour over to that trust. So we weren't heirs at law. We had no standing. Finally, the question, I guess, has been joined today and in this case about whose duty is it first to start talking about what's in Francis' trust after Francis dies? Let's look at my clients. They're blood relatives, but they're not named in the will. They may be named in the trust, but they don't know that, and they don't know what's in the trust. Then on the other side, you have Jay, who's a fiduciary. He's a fiduciary for Francis, both in law and in fact, from March of 1994 up and through her death. Then he's the acting trustee, and he's the lifetime beneficiary of her trust, of which my clients are contingent beneficiaries. Whose duty is it to do anything first? He's the fiduciary. I submit to this court that it's Jay's duty. His silence and his failure to tell my clients of anything regarding their rights was all part and parcel of the scheme put in place in 1994 to void Francis' estate of any cash before she went to the nursing home. And for that reason, because he's first, I think that's a key to the case, and for that reason we would ask that this court reverse the circuit court. You first came into the case in December of 2005. Maybe a week, yes. That's when the claim period was going to expire December 1st. Correct, and I filed on that date. Was there anything to preclude you while this case was pending before Judge Coleman from scheduling a deposition of the lawyer, Mr. Jostak? After December, yes. He never was deposed, was he? Mr. Jostak? No, he's never been deposed in this case. As I was explaining in the beginning of my rebuttal, when my subpoenas were quashed, it was made pretty clear to me that there would be no discovery of any kind, any further discovery except the exchange of documents, until we're at issue. We were still trying to get at issue when this case was dismissed. So, no, there's never been a deposition of the medallion signatory bankers, of Mr. Jostak or anybody else in the family or anybody, or medical care providers. But I sure would like to have an opportunity to take some. Thank you. Thank you, Your Honor. The matter will be taken under advisement.